UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE 860-549-3205 STORED AT A PREMISES CONTROLLED BY VERIZON | Case No. 20MJ967 (TOF)<br><br>November 9, 2020<br><br>**Filed Under Seal** |
|---|---|

**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT
AND AN ORDER PURSUANT TO 18 U.S.C §§ 3122 AND 3123**

I, Jesse Nason, United States Postal Inspector, being first duly sworn, hereby depose and state as follows:

1. I make this affidavit in support of an application for a search warrant for information associated with certain cellular devices assigned (a) (860) 549-3205 (hereafter referred to as **"TARGET TELEPHONE"**), a prepaid phone with unknown subscriber information, that is believed to be in the District of Connecticut or the District of Connecticut, the records and information for both of which are in the custody or control of Verizon (the "Service Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ 07921. As a provider of wireless communications service, the Service Provider is a provider of an electronic communications service, as defined in 18 U.S.C. § 2510(15).

2. The information to be searched is described in the following paragraphs and in Attachment A to the search warrant. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require the Service Provider to disclose to the government the information further described in Section I of Attachment B of the search warrant. Upon receipt of the information described in Section I of

Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

3. Because I am seeking the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices (pen-trap devices) to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from TARGET TELEPHONE 1.

4. I am currently assigned to the United States Postal Inspection Service ("USPIS"), Boston Division. I have been employed as a Postal Inspector since February 2014. Prior to becoming a Postal Inspector, I was employed as a police officer for approximately seven years with the Wilbraham Police Department, Wilbraham, Massachusetts. I have a Masters in Criminal Justice from Anna Maria College in Paxton, Massachusetts. I am authorized to investigate Postal offenses and civil matters relating to the Postal Service; to carry firearms; serve warrants and subpoenas and make arrests pursuant to 18 U.S.C. Section 3061 and administer oaths under 39 U.S.C. Section 1010. As part of my duties as a United States Postal Inspector, I investigate the use of the United States Mail to illegally transport controlled substances and drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), and 846. I have been trained in various aspects of law enforcement, including the investigation of narcotics offenses. Further, I have been designated as a Subject Matter Expert (SME) by USPIS. I am responsible for assisting with course development and the training of other Inspectors and Task Force Officers in the investigation of narcotics trafficked via the US Mail. Through my education and experience and

that of other agents assisting in this investigation, I have become familiar with the methods that individuals use to traffic narcotics through the United States Mail.

5. I am currently assigned to the USPIS sponsored Narcotics and Bulk Cash Trafficking Task Force (herein after "NBCT-TF"), which includes responsibilities for investigating narcotics and illicit proceeds trafficked via the US Mail, along with assaults and robberies of post employees and robberies and burglaries of postal facilities. The NBCT-TF currently consists of seven Postal Inspectors, a detective from the Hartford and New Britain Police Departments, a Special Agent from the USPS Office of Inspector General, and a Criminal Analyst from the Connecticut National Guard.

6. Based on my training, my experience with the USPIS, and my discussions with other agents about their experience, I have become familiar with the logistics of the parcel delivery services and have developed an understanding of why parcel services appeal to those who choose them for dispatching controlled substances and the proceeds from the sales of controlled substances. Parcel delivery services offer rapid and dependable service for most metropolitan areas, and sometimes are used by individuals to surreptitiously transport controlled substances and narcotics. This method is advantageous to the drug trafficker because parcels are guaranteed by the parcel delivery services for delivery in the number of days specified at the time the parcel is sent, and parcel delivery services offer a refund if the parcel does not meet the service standards. Based on my training and experience, I have learned that the refund typically is a minor consideration for individuals who use parcel delivery services to illegally transport controlled substances, narcotics and the payment or proceeds for the distribution of controlled substances. However, a parcel's delivery delay beyond the allotted normal delivery time may serve to alert the recipient that law enforcement authorities may have discovered the controlled substances and/or

the payment/ proceeds from the distribution of controlled substances. Additionally, parcel delivery services use assigned label numbers, which make it easy for the parcels to be tracked by the sender of the parcel. The sender of the parcel is given a time of shipment for the parcel, as well as the weight of the parcel. Based on my training and experience, traffickers in illegal narcotics and the proceeds of illegal narcotics are known to use parcel services to transport their product and/or proceeds because it is relatively anonymous, secure, and fast.

7. Based on my training and experience, I know that narcotics traffickers often use cellular telephones, and often speak to one another using coded, cryptic or slang words and phrases, in the belief that, by doing so, they can thwart the efforts of law enforcement to identify them and their activities and to seize their drugs and/or assets. From my experience, I am familiar with many of the code words and phrases that are frequently used by drug traffickers in the acquisition and distribution of narcotics. As such, I am familiar with the behaviors, methods and common practices of persons and organizations that illegally traffic and distribute controlled substances, as well as the devices commonly utilized by them.

8. The information contained in this affidavit is based on my personal knowledge and experience, the observations I made during the course of this investigation, information conveyed to me by other law enforcement officers, through interviews of witnesses, and the knowledge and experience of my law enforcement colleagues.

9. I am currently participating in an investigation of ▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓, and others, for various federal narcotics trafficking offenses.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); and 843(b)

(Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Offenses") have been committed, are being committed, and will be committed by the aforementioned individuals and others. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

11. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

12. As explained in greater detail herein, the NBCT-TF is conducting a criminal investigation into a drug trafficking organization (hereinafter "DTO") based in Waterbury, Connecticut, believed to be responsible for shipping kilogram quantities of cocaine via the U.S. Mail from Puerto Rico to multiple addresses in Waterbury. It is believed that SOTO controls the stateside activities of this DTO and coordinates the deliveries of U.S. Mail parcels containing illegal narcotics and narcotics proceeds in the form of bulk cash.

### TERMS and NOMENCLATURE

13. There are a number of terms that are used throughout this affidavit that are specific to narcotics investigations and more specifically narcotics investigations where US Mail is being utilized to traffic the narcotics.

14. The USPS has a business model that strives to provide customer service to all who utilize the services provided by the USPS. The USPS has several ways that customers have the ability to check on the status of a piece of mail. A tracking number is associated with most parcels and this tracking number makes each parcel unique. If a customer chooses to check on the status

of a parcel, they can call the USPS help number (1-800-ASK-USPS), go to the USPS website, or go to the USPS smartphone application. In all instances, the tracking number must be referenced in order to query the status of the parcel.

15. When a customer proactively inquiries about the status of their parcel, the USPS captures and saves this identifiable information (such as email addresses, phone number, IP address etc.). Upon being saved, that information becomes part of postal business records.

16. Based on my training and experience and conversations with other law enforcement agents, I know that narcotics traffickers who utilize the US Mail will often find an address(es) and/or individual(s) to accept parcels for them to insulate themselves from potential law enforcement detection. These addresses are often referred to as a "drop address." This method is used to add a degree of separation between the delivery of the narcotic parcel and the true intended recipient. I also know that narcotic traffickers who utilized the US Mail will often wait a certain amount of time after the parcel has been delivered in an attempt to make sure law enforcement is not conducting a controlled delivery of the package.

17. Once it appears that the parcel has been "safely" delivered, the true recipient will go pick up the parcel at the delivery address or meet at an alternate location to retrieve the parcel. At times, the more sophisticated groups will employ a mail carrier to deliver the parcel for them. By directing a mail carrier, the receiver has the ability to have the parcel delivered "off route" and to locations that are more appealing to them in an effort to avoid law enforcement.

18. Based on my training and experience, I know that cocaine is primarily manufactured in the countries of Colombia and the Dominican Republic. Cocaine is then outsourced to other countries and locations for distribution. Puerto Rico is a location that receives a large quantity of cocaine. Puerto Rico is an advantageous location for cocaine

traffickers because of its proximity to and relative ease of transport from Colombia and the Dominican Republic. Additionally, Puerto Rico is a desirable location because it is a territory of the United States of America, and thus, items shipped from Puerto Rico to other U.S. States or Territories are not subject to customs searches.

19. The U.S. Mail is one of the preferred methods of shipment for narcotics traffickers because of the protections afforded to every piece of the mail by the United States Constitution. Narcotics traffickers are aware that a search warrant is required for law enforcement to execute a search on a piece of mail. Furthermore, narcotics traffickers know that the USPS operates under a business model that allows its customers to track most mailings within the postal system as a form of customer service. The ability to track shipments allows the distributor and/or customer to check the status and location of each shipment.

20. Based on my training and experience I am aware that narcotics traffickers oftentimes keep their surplus of narcotics at a location often referred to as a "stash" or "stash house." The stash location is often not the same location where the trafficker lives. A stash location is utilized to maintain a separation between the trafficker and the narcotics. Traffickers will often times choose a non-descript location to stash their narcotics in an effort to keep the drugs hidden from law enforcement and potentially from the criminal element to avoid being victim of a robbery.

21. Additionally, a "stash house" or "stash" is often times utilized to prepare narcotics for sale. The trafficker will prepare certain quantities of the narcotics for sale at the stash prior to making a drug deal in order to save time. The ability to make a drug deal quicker allows for a smaller window to have contact with law enforcement. A trafficker employing this method will often be required to make frequent trips to a stash house.

## BACKGROUND OF INVESTIGATION

22. Beginning in December 2019, the NBCT-TF has been investigating a large-scale drug trafficking organization ("DTO") operating out of Waterbury, Connecticut. The DTO is directed by ▓▓▓▓ The DTO mails parcels of cocaine out of various U.S. Post Offices located on the island of Puerto Rico. ▓▓▓▓ appears to be coordinating various "drop addresses" in the City of Waterbury for the delivery of the parcels containing cocaine. The parcels are then transported by ▓▓▓▓'s runner, ▓▓▓▓, to locations in New Britain and Hartford, Connecticut.

23. Throughout the course of this investigation investigators have identified multiple addresses in the Waterbury area that have received suspicious parcels via the US Mail. Following the deliveries of the parcels, investigators have observed ▓▓▓▓ take possession of the parcels and drive them to ▓▓▓▓ at locations in New Britain and Hartford.

24. Investigators identified a parcel addressed to "▓▓▓▓ Waterbury, CT 06706" and bearing a return address of "▓▓▓▓ ▓▓▓▓, Villalaba, P.R. 00766", with an approximate weight of 13lbs and 13oz, with affixed postage of $52.45. The address of 107 Dixie Ave., had been previously identified by investigators as being associated with the ▓▓▓▓ DTO, based on that information investigators were able to execute a canine examination on the parcel which resulted in a positive alert.

25. On October 29, 2020, investigators executed a federal search warrant that was authorized by the honorable federal magistrate judge Robert A. Richardson on a USPS Priority Parcel bearing 9505 5114 1636 0298 3532 80 (herein after SUBJECT PARCEL). Upon execution of the search warrant the SUBJECT PARCEL was found to contain approximately two kilograms of cocaine, which field tested positive for the presumptive presence of cocaine.

26. On or about November 2, 2020 an individual identifying himself as "▓▓▓▓▓▓" contacted the USPS customer service unit providing the phone number of (860) 549-3205 and email address of ▓▓▓▓▓▓@gmail.com as contact info. "▓▓▓▓" inquired about the status of the SUBJECT PARCEL by providing the correct twenty-two USPS Priority tracking number. The fact that the caller had these details leads me to believe that the caller was either the mailer or intended recipient of the two kilograms of cocaine found inside the parcel. It is also my belief that precision location information as to the TARGET TELEPHONE will lead to evidence of the identity of this person and/or stash locations for drugs and drug proceeds maintained by this DTO.

27. Based upon all of the foregoing facts, as well as my training and experience and that of other law enforcement personnel participating in this investigation, I believe that there is probable cause to believe that **TARGET TELEPHONE** is being used in furtherance of drug trafficking activity and that the requested information will help investigators locate **TARGET TELEPHONE** and will also lead to evidence of the Target Offenses. The location of **TARGET TELEPHONE** is likely to lead to the discovery of evidence of drug trafficking activity, including potential stash locations for quantities of narcotics. In my training and experience and in conversations with other law enforcement officers familiar with drug trafficking activity, drug traffickers, as appeared to be the case here "▓▓▓▓▓", usually carry their cell phone(s) on their person to narcotics transactions to facilitate the meeting, to communicate with the associates they intend to meet with on an ongoing basis, and to keep track of the whereabouts of their associates en route to a meet location and while they are at their stash locations. Having the cell phone on their person allows the meet location to be changed very quickly or set at the last moment, which is often a counter-surveillance ploy. In addition, having the cell phone(s) on their person allows

them to conduct business more efficiently and while on the move even when they visit stash locations or sources of supply. In addition, having a cell phone on their person also allows a drug trafficker to arrange other transactions while going to one transaction to ensure a consistent flow of business.

28. In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (*i.e.*, antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (*i.e.*, faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

### Cell-Site Data

29. Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about **TARGET TELEPHONE**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the

communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

### E-911 Phase II / GPS Location Data

30. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

31. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of **TARGET TELEPHONE**, including by initiating a signal to determine the location of **TARGET TELEPHONE** on the Service Provider's network or with such other reference points as may be reasonably available.

### Pen-Trap Data

32. Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number (ESN), a Mobile Electronic Identity Number (MEIN), a Mobile Identification Number (MIN), a Subscriber Identity Module (SIM), a Mobile Subscriber Integrated Services Digital Network Number (MSISDN), an International Mobile Subscriber Identifier (IMSI), or an International Mobile Equipment Identity (IMEI). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

## AUTHORIZATION REQUEST

33. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

34. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

35. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of **TARGET TELEPHONE** on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The

USPIS shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

36. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days "after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of **TARGET TELEPHONE** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

37. Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of

the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate **TARGET TELEPHONE** outside of daytime hours.

Respectfully Submitted,

Jesse Nason
Digitally signed by Jesse Nason
Date: 2020.11.09 17:31:55 -05'00'

Jesse Nason
United States Postal Inspector

Subscribed and sworn to before me on the __9th__ day of November, 2020.

via phone per Rule 4.1

/s/ TOFXXXXXXXXXX
Date: 2020.11.10 13:07:31 -05'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned 860-549-3205 (hereafter "**TARGET TELEPHONE**"), a cellular phone with unknown subscriber information, that is in the custody or control of Verizon (the "Service Provider"), a wireless communications service provider that is headquartered at 180 Washington Valley Road, Bedminster, NJ 07921.

## ATTACHMENT B

### Particular Things to be Seized

**I. Information to be Disclosed by the Provider:**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

1. Information associated with each communication to and from 860-549-3205 ("**TARGET TELEPHONE**") for a period of 30 days from the date of the warrant, including:

    a. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

    b. Source and destination telephone numbers;

    c. Date, time, and duration of communication; and

    d. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which **TARGET TELEPHONE** will connect at the beginning and end of each communication.

    The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, under the same docket number, for such information associated with **TARGET TELEPHONE**.

2. Information about the location of **TARGET TELEPHONE** for a period of 30 days, during all times of day and night. "Information about the location of **TARGET TELEPHONE** includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information

a. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of **TARGET TELEPHONE** on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

b. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

3. This warrant does not authorize the seizure of the contents of any communications.

4. **II. Information to be Seized by the Government:**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution of narcotics, possession with intent to distribute narcotics); 846 (conspiracy to distribute and possess with intent to distribute narcotics); and 843(b) (Use of a Communication Facility to Facilitate a Narcotics Trafficking Felony) (hereafter referred to as the "Target Offenses") have been committed, are being committed, and will be committed by Joseph Giovanni SOTO and others yet to be identified during the a thirty (30) day period from the date of the warrant.